Arthur E. Moreton v. Commissioner. Arthur E. Moreton and Ethel T. Moreton v. Commissioner.
Moreton v. Commissioner
Docket Nos. 29488, 29489.
United States Tax Court
1952 Tax Ct. Memo LEXIS 224; 11 T.C.M. (CCH) 478; T.C.M. (RIA) 52138; May 14, 1952
*224 Payment of $250,000 to sellers (including petitioners) pursuant to an agreement envisaging conveyance of a mining claim under which sellers reserved to themselves for a period of thirty years mineral rights to all ore in excess of 1,000,000 tons, and the grantee was not obligated to mine any ore, held to be proceeds of sale of a capital asset. A. Calder Mackay, Esq., and Adam Y. Bennion, Esq., for the petitioners. Charles H. Chase, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: Petitioners contest the following deficiencies in income tax determined by respondent: Year
Amount
Arthur E. Moreton
1947
$51,749.48
Arthur E. Moreton and Ethel
T. Moreton
1948
58,581.89
The sole question for decision is whether the sum of $250,000 of which petitioners received $125,000 in 1947 and $125,000 in 1948 pursuant to an agreement with a mining company was ordinary income subject to depletion or long term capital gain. This, in turn, depends upon whether the agreement was a lease or a sale. Other minor adjustments made by respondent are not contested. Also, the parties have stipulated an issue concerning *225 the ownership of the mining claim involved herein. Some of the facts have been stipulated, are so found, and the stipulation is incorporated herein by reference. Findings of Fact Petitioners are individuals, husband and wife, residing in Salt Lake City, Utah. Petitioner Arthur E. Moreton filed a separate return for 1947 as did petitioner Ethel T. Moreton. For 1948 petitioners filed a joint return with the collector of internal revenue for the district of Utah. Petitioners each owned an undivided one-third interest in Sunbeam #8 Lode Mining Claim with their son and daughter, John R. Moreton and Susan Moreton, respectively, each owning an undivided one-sixth interest in said mining claim. Each of said individuals acquired his or her interest in said mining claim during the year 1941, except Susan Moreton, who acquired her interest during the year 1946. On November 21, 1947, petitioners and their son and daughter entered into an agreement after prior negotiations with Columbia Iron Mining Company (hereinafter called the Mining Company). During prior negotiations petitioner Arthur E. Moreton rejected an offer to lease the mining claim involved and informed the president of the *226 Mining Company who was negotiating for said company that he would agree only to a sales arrangement since it was uncertain when the Mining Company would mine the property and that since petitioner was 61 years old he was more interested in presently receiving cash from the transaction. Pursuant to the agreement of November 21, 1947 the Moretons agreed to convey said mining claim by good and marketable title to the Mining Company by Utah statutory form of warranty deed "reserving unto Sellers [the Moretons] for a period of thirty (30) years the mineral rights to and the right to mine, or have others mine, all iron ore in the Mining Claim in excess of one million (1,000,000) gross tons (2240 lbs. per ton) of iron ore, * * *" The agreement further provided as follows: "3. The purchase price of the Mining Claim, to be paid by Mining Company to Sellers upon receipt and approval by Mining Company of Sellers' deed conveying the Mining Claim to Mining Company, shall be Two Hundred Fifty Thousand Dollars ($250,000). "In the event that the patent on the Mining Claim shall not have been issued by the Bureau of Land Management, United States Department of the Interior, on the date the *227 Mining Claim is conveyed to the Mining Company as hereinabove specified, the purchase price of the Mining Claim shall be paid as follows: (a) One Hundred Twenty-Five Thousand Dollars ($125,000) to be paid by Mining Company to Sellers upon receipt and approval by Mining Company of Sellers' deed conveying the Mining Claim to Mining Company; (b) the balance of the purchase price, namely, One Hundred Twenty-Five Thousand Dollars ($125,000) to be paid by Mining Company to Sellers upon issuance of said patent on the Mining Claim to Sellers and transfer of said patent, in a manner to be approved by Mining Company's counsel by Sellers to Mining Company. In the event that patent has not been issued on the Mining Claim by the time the first Five Hundred Thousand (500,000) gross tons (2240 lbs. per ton) of iron ore have been mined and shipped from the Mining Claim, the second Five Hundred Thousand (500,000) gross tons (2240 lbs. per ton) from the Mining Claim will be paid for by Mining Company at Twenty-Five Cents ($0.25) per gross ton (2240 lbs.) of iron ore mined and shipped by Mining Company on a monthly basis. The total amount paid by Mining Company to Sellers on the basis of gross tons (2240 *228 lbs. per ton) of iron ore mined and shipped shall be applied against the second One Hundred Twenty-Five Thousand Dollars ($125,000) to be paid by Mining Company when patent issues on the Mining Claim. "4. Mining Company shall have the prior right to mine and ship any of the iron ore in the Mining Claim reserved by Sellers. For each gross ton (2240 lbs.) of iron ore which is mined and shipped by Mining Company out of said iron ore in excess of One Million (1,000,000) gross tons (2240 lbs. per ton) reserved by Sellers as aforesaid, during the period said ore is reserved by Sellers, Mining Company shall pay Twenty-Five Cents ($0.25) if the ore is extracted by open pit methods and Twelve and One-Half Cents ($0.125) if the ore is extracted by underground methods. "Mining Company shall conduct its mining operations in such a manner as will not unduly interfere with, or make impracticable, the extraction of the ore that will not be extracted by Mining Company. In the exercise of its right to mine any or all of said iron ore to which the mineral rights are reserved by the Sellers, Mining Company shall be obligated to extract said ore only to the extent that, in the judgment of Mining Company, *229 said ore can be mined safely and economically in accordance with approved methods of iron ore mining. "5. Mining Company agrees to supplement the exploratory drilling of United States Bureau of Mines on the Mining Claim by means of magnetometer surveys over the portions of the Mining Claim not covered by said exploratory drilling. Mining Company shall, upon request of Sellers, make available to Sellers the results of Mining Company's magnetometer surveys. "6. Mining Company agrees that it will not place overburden stripped from the claim, or other refuse materials, on any portion of the Mining Claim where exploratory drilling or magnetometer surveys indicate the presence of ore in mineable quantities. Mining Company shall be required to make said magnetometer surveys before dumping overburden or refuse materials on the Mining Claim. Subject to the preceding provisions of this paragraph, Mining Company shall have the right to deposit waste materials from other lands of Mining Company on the lands covered by said deed of conveyance. The phrase 'other lands of Mining Company' as used in this paragraph shall be deemed to include lands of others than Mining Company on which Mining Company *230 shall have Mining rights. "7. Sellers shall not exercise their right to mine, or to have others mine, the iron ore to which said right is reserved by Sellers until after Mining Company shall have mined and shipped the one million (1,000,000) gross tons (2240 lbs. per ton) of iron ore hereinabove specified, and then only to the extent that Mining Company relinquishes its prior right to mine and ship such reserved ore pursuant to this paragraph 7. In any event, after the expiration of fifteen (15) years following the date of the conveyance contemplated by this agreement, Mining Company shall, if requested by Sellers, relinquish to Sellers said prior right to mine said ore reserved by Sellers, as to such ore as shall not then have been mined by Mining Company. "In the event that Mining Company shall relinquish its prior right to mine and ship any of the ore so reserved by Sellers, Sellers shall not, in the exercise of their right to mine or to have others mine the iron ore so reserved by Sellers, unduly interfere with the operations of Mining Company, and Sellers shall conduct their operations in accordance with approved methods of mining engineering under the direction of an accredited *231 mining engineer. Sellers' general plan of extraction shall be subject to the approval of Mining Company's engineers. Mining Company will, without any additional expense to itself and subject to the requirements of its own operations, afford reasonable means of access to and from such mining operations as Sellers may undertake, or have others undertake for them, on the Mining Claim over existing roadways on Mining Company's property. "8. In the mining of the one million (1,000,000) gross tons (2240 lbs. per ton) hereinabove specified, Mining Company shall conduct its operations in accordance with approved methods of mining engineering. Except as otherwise provided in specific provisions of this agreement, Mining Company shall have unrestricted authority over its mining and shipping operations contemplated by this agreement, including the mining methods to be employed, the selection of ores to be mined and the extent of extraction to be realized." The agreement also contained detailed provisions for determining the amount of ore shipped from the claim. Petitioner Arthur E. Moreton is generally familiar with the mining industry around Salt Lake City and on several occasions after *232 1919 "had a mining claim now and then and dropped them, like most lawyers do up there, trying to find something". Sunbeam # 8 Lode Mining Claim is adjoined on the east by Burke # 2 Mining Claim which is being mined by the Mining Company. The ore body in Burke # 2 extended in a westerly direction into a portion of Sunbeam #8 and at the time petitioner Arthur E. Moreton was negotiating with the Mining Company he knew that the Company was then mining on Burke #2 and was told that eventually it would want to mine the ore in Sunbeam # 8. Various estimates had been prepared of the amount of ore in Sunbeam # 8, some on behalf of the Mining Company prepared from data obtained from the United States Bureau of Mines, and at least one by an engineer on behalf of petitioner Arthur E. Moreton. These estimates showed that there were perhaps two and one-half million tons in Sunbeam # 8, but that the estimated tonnage of commercial ore was approximately 1,000,000 gross tons. On November 22, 1947, pursuant to the agreement of November 21, 1947, the Moretons conveyed Sunbeam # 8 Lode Mining Claim to the Mining Company by warranty deed which was duly recorded. This conveyance was limited by the *233 following recitals contained in the deed: "Subject to the paramount title of the United States of America. The grantors reserve unto themselves, for a period of thirty (30) years, the mineral rights to and the right to mine or have others mine, all iron ore in the above described mining Claim in excess of one million (1,000,000) gross tons (2240 lbs. per ton) of iron ore." On the same date, the president of the Mining Company acknowledged by letter addressed to Arthur E. Moreton the receipt of the warranty deed, which the Company approved. This letter contained the following statement: "* * * In view of the fact that patent has not issued on said Mining Claim, the Company is making payment of the purchase price in accordance with the provisions of the second paragraph of paragraph 3 of said agreement. There is transmitted herewith the Company's Voucher No. 01315 drawn on Wells Fargo Bank & Union Trust Co., San Francisco, California, to Arthur E. Moreton, E. T. Moreton, J. R. Moreton, and Susan Moreton, in the amount of One Hundred Twenty-Five Thousand Dollars ($125,000) as initial payment upon the purchase price of Two Hundred Fifty Thousand Dollars ($250,000) for the Sunbeam *234 # 8 Lode Mining Claim." Further in pursuance of the agreement, on January 24, 1948, and pursuant to the issuance of a patent by the United States Government on Sunbeam # 8 Lode Mining Claim the Moretons executed and delivered to the Mining Company a Correction Utah Statutory Warranty Deed wherein the sentence, "Subject to the paramount title of the United States of America", was omitted. Thereafter, under date of January 26, 1948, the Mining Company sent a check and voucher for $125,000 enclosed in a letter containing the following statement: "Pursuant to the provisions of paragraph 3 of the November 21, 1947 Agreement between Arthur E. Moreton, E. T. Moreton, his wife, J. R. Moreton, his son, and Susan Moreton, his daughter, and Columbia Iron Mining Company for the purchase of the Sunbeam # 8 Lode Mining Claim, there is transmitted herewith the Company's Voucher Treas. No. 00105 drawn on Wells Fargo Bank & Union Trust Co., San Francisco, California, to Arthur E. Moreton, E. T. Moreton, J. R. Moreton, and Susan Moreton, in the amount of One Hundred Twenty-Five Thousand Dollars ($125,000) as final payment upon the purchase price of Two Hundred Fifty Thousand Dollars ($250,000) *235 for the Sunbeam # 8 Lode Mining Claim." At no time subsequent to the acquisition of the mining claim has the Mining Company mined any iron ore from said claim, nor is it under any obligation whatsoever to do so. Petitioners are not and never have been engaged in the mining business. The cash payments received by the petitioners were proceeds from the sale of capital assets held for longer than six months. Opinion The question is not novel. Did the transactions add up to a mineral lease for the exploitation and development of the mining properties or did they amount, so far as the sums here involved are concerned, to an outright purchase and sale of 1,000,000 tons of ore? The accepted approach to the problem is the familiar one of arriving at the character of the transaction by determining the purpose and intent of the parties after a careful consideration of all the surrounding facts and circumstances. , aff'g , cert. denied . The form of the instruments drawn and the language employed by the parties are not to be ignored. They are evidentiary facts entitled to consideration, *236 albeit a cautious consideration, for things are not always what they seem. We have before us a written agreement envisaging the execution of a Utah statutory form of warranty deed which was in fact executed. This followed negotiations during which petitioner expressly turned down a proposed leasing arrangement. As we interpret it, the deed conveyed to the Mining Company 1,000,000 gross tons of iron ore with the right to mine it under certain conditions. Petitioners retained no right or title to that amount of ore. They did reserve to themselves all ore in excess thereof for a period of thirty years and gave the Mining Company certain privileges of mining the excess ore for specified royalties over and above the $250,000 payment here involved. That payment, as we see it, however, was the purchase price of the million tons conveyed outright. It did not depend upon the mining of any ore whatsoever. The payment was required to be made, and was made, upon the receipt and approval by the Mining Company of the deed of conveyance of the mining claim. The monies were designated "purchase price" in the agreement and that designation was consistently carried through in the vouchers and letters *237 employed in completing the payment. Respondent insists, however, that the transactions amounted to a lease because petitioners reserved to themselves all mineral rights in excess of one million tons of ore "which is of itself consistent only with the idea of a lease". In our opinion this does not necessarily follow. There can be a sale of all or part of the minerals under a tract of land and a reservation of part by the sellers without constituting the transaction a lease. Indicative of a sale here is the payment of the large cash consideration in advance of any mining of ore coupled with the lack of obligation on the Mining Company to remove any ore whatsoever. This would seem to negative any finding that the dominant purpose of the parties was to secure the exploitation and development of the properties for mining purposes, a purpose of significance in determining if a transaction is a lease, Added to this is the fact that there had been no removal of ore from the property at the time of hearing this proceeding, approximately four years after conveyance of the claim. It is also to be noted that the various estimates of ore contained in Sunbeam *238 # 8 indicated little, if any, more commercial ore than the 1,000,000 tons conveyed to the Mining Company. This would militate against ascribing to the parties the predominant purpose of developing the properties since the mining value of the ore reserved to petitioners might well prove to be negligible. On the record before us we find that the transaction amounted to a sale rather than a lease and that the $250,000 paid was paid for a capital asset held for longer than six months. Because of other adjustments. Decision will be entered under Rule 50.